Case No. 19-1040, Darlene Brown v. Kelsey-Hayes Company, et al. Argument not to exceed 15 minutes per side. Mr. Gusarik, you may proceed for the appellant. Good morning, Your Honors. May it please the Court, Don Gusarik appearing on behalf of the plaintiff appellant Darlene Brown. With the leave of the Court, I would reserve three minutes for rebuttal. Your Honor, I think this is a very straightforward case. Ms. Brown was employed by ZF or TRW or whatever the title was at the time of her termination for approximately 14 years. For most of those years, from 2006 through 2015, she was employed as an executive assistant to Ms. Slopansky, who was in charge of internal audit at ZF. With the purchase of the company by ZF in the middle of 2015, there were a number of changes, including the fact that Ms. Slopansky realized and appreciated the fact that her job would be eliminated and transferred back to Germany and wouldn't be conducted here in the United States. As a consequence, she resigned her employment in November of 2015. Just prior to her resignation, her submission of her resignation, her last day with the company was actually in December. She conducted a review of Ms. Brown. She had done so for any number of years over the period of time that they had worked together, and during that period of time had consistently evaluated Ms. Brown as a solid contributor to the company. There was one year – She always raised concerns, though, in those evaluations. She did. She did. And I would suggest to the court that that is a normal process. If you're going to do a performance evaluation for any employee over the course of the year, that you do two things. Number one, you identify the things that they do well, but you also identify areas for improvement. That's a normal and proper course of conduct. In fact, typically in most companies, if you look at the evaluations that are conducted over a year, there's only a small percentage that reach that very top element of, in this case, outstanding contributor. It might be 5%. Over the course of the year, the bulk of the individuals are in that middle category. Is it unreasonable for a company when hiring to shoot for people that are outstanding contributors, or are they required by law for some reason to settle for something? I think they can make adequate choices. What they cannot do – I think they can look for the best candidate available. No doubt about it. I appreciate that. The answer has to be yes, right? Pardon? The answer has to be yes. Has to be yes. You look for the best possible candidate that's available. But I would point out to the court here that in this case, even Ms. Zazzetti testified that a person who is a solid contributor over a course of history, even a solid contributor minus, is not disqualified from being considered. If I didn't know the person and I read the evaluations from 2013 to 2015, the last three years, I mean, it would give me pause to hire someone with these issues, right? Because if – and I'm sorry – if there were other candidates that I thought were better. Correct. If they're on their face, if on its face you had a better candidate under these circumstances, where she was terminated because her position was eliminated, and they acknowledged that she was not terminated for any performance issue. It had nothing to do with her separation. It was solely because Ms. Lipansky's position was eliminated. At that time, there were three open positions.  which suggested that they had to consider her at that time for those three openings that were available in December of 2015, January of 2016. She was never considered. She raised it at a termination meeting and said, are there any other positions for which I'm a candidate than the job posting policy, which said under those circumstances, if you could eliminate a job elimination, you look at that candidate. They never did. Ms. McConigle sat at that meeting, the head of HR, never suggested that there were open positions that she was qualified for. And she was qualified for them. She was a solid contributor. In response to your suggestion in terms of whether or not she was a good candidate, I would strongly urge the court to take a look at the last three evaluations, even the one where in 2014, where in 2013, where it was suggested that she needed improvement. Because if you look there, there are, and I think this is where Judge Tarnow made his mistake. If you look at his opinion, all he does is look at the negative. And I think you have to look at the positive. And if you look at the positives. I guess I don't understand why, just explain to me why a company has to, if I'm making a hiring decision, you're often looking for reasons to eliminate people when you hire. And so if there's a number of reasons she's struggling to perform, as they said, certain aspects of the job, why do I need to look at the positive too if I think I've got someone who doesn't have that negative? Number one, you're balancing one known versus a complete unknown. That's hiring. But that's not what most companies do. If I have a known, I'm going to use it in my process. And I'm going to weigh that against the unknown. I would suggest that what the known was that the parties here looked at was the fact that Ms. Brown suffered from asthma, utilized FMLA to its maximum for the prior three years, was acknowledged by the HR officer. I'm sorry to interrupt you. I'm sorry. I apologize. No, no, no. I apologize. What evidence is there in the record that the people that made these decisions actually knew all of that? I would submit, by inference, Your Honor, frankly, other than Ms. McConigle. Ms. McConigle, the head of HR, clearly knew that she suffered from asthma. But was she a decision maker? She's the one who gave Ms. Brown her termination notice. She sat in at the meeting. She certainly would have known that Ms. Lipansky had. But the termination isn't the problem. It's not being hired in these other. Right, right. I agree. Well, it's both. Because at the time of her termination, there were open positions available for which she was not considered. There were open positions. And the normal course of events, pursuant to their own policy, was to give that position to a person who's internal. That's what the job posting provides. That's what the job recruitment provides, to eliminate a job elimination. If you can do that, you can transfer someone from a position who's being eliminated to a position that's open, you do it. Especially if the person is a solid contributor and hasn't had any problems. If you look at those evaluations over the years, and just don't focus on the few negative comments, but look at all the positives, provides good support to the IA team, can be counted on to fully research assignments, perform meaningful analysis, identify alternatives to make appropriate recommendations. Can I go to the pretext, though? Is it just that it's so unbelievable that they would, that on the face of those evaluations, it's so unbelievable? I think it goes beyond that. Ms. McConigle, I think, is the key to this. And I think a jury looking at this could reasonably assume that Ms. McConigle, when she had her discussions, and she met personally with both Ms. Hoy and Mrs. Zetti. After she meets with Ms. Hoy and personally delivers these last three evaluations, and I think the testimony summarizes them with Ms. Hoy, Ms. Hoy, from that point forward, doesn't consider her for any open positions. And if you look at the form that they provided in terms of, you know, it categorizes and follows applications by individuals, from that point on, every comment was not interested. In fact, Ms. Hoy testified that Ms. Brown would never be interviewed, would never be interviewed, despite the fact that she's a solid contributor throughout her history. It's just absurd to suggest that there weren't discussions between Ms. McConigle and Ms. Hoy relative to her absences from the company. The woman came in in a wheelchair every day. She was on oxygen every day. And to suggest that people in the same building with her didn't know that was her is ludicrous. So your position is not that the employer couldn't look for good employees or a better employee, but simply that in the reaching of that decision as to who to hire, they were not permitted to take into account her disability, unless, of course, it couldn't be accommodated legally. Wait a minute. I'm trying to help you out. I'm going to sit down. And they obviously couldn't take into account the taking of the FMLA leave. Right. They did. I mean, there was a questionnaire that was filled out by applicants, do you suffer from any disability. One of the questions, one of the questions, and I found this just totally bizarre, one of the questions that Ms. Zazetti asked was, how much time do you think it's reasonable for an employee to take off from work other than vacation? That's a question she asked of people. I mean, that to me suggests that you're looking at trying to eliminate folks who may have a history of FMLA use or may have a history of disability or have some restriction on their ability to perform the job. Despite those things, she did a great job for nine years and can't get an interview. So in trying to look at the issue of pretext and going through the McDonnell-Douglas balancing, what's the, what's your best argument as to why the decision, the adverse decision regarding your client's employment was pretextual? I think it goes to the discussions that Ms. McConigle met with Ms. Zoi, met with Ms. Hoy, met with Ms. Zazetti, and after that, this individual, who's a solid contributor for nine years, who was out of needs improvement and did improve, did improve, under those circumstances could not even be interviewed and was told that she would never be interviewed. Under those circumstances, I would think, given the testimony of those individuals, where Ms. Zazetti said she's not disqualified because she's a solid contributor or even solid contributor minus. We consider those people. That's what she said. She wasn't terminated for a performance. Actually, she was not permitted even to, her application was not permitted to even be considered. Never, never, never considered. She said she would never be interviewed, period. End of story. Regardless of the position, regardless of any other candidates, she would never be interviewed. That suggests to me that it goes beyond her performance, and I think that rises to the level where it creates at least a legitimate question of fact for the jury to decide whether or not the reason that they're giving that it was, oh. Can you explain why it goes beyond her performance? I'm not sure I follow that point. I'm not sure I understand the question. You're terrible at your job. I'm never going to interview you for another. She wasn't terrible at her job. No, no, no. I'm saying explain why it goes past her performance. I think it goes past her performance because I think any reasonable person reviewing the facts of this case and reviewing the performance evaluations of Ms. Brown would suggest here's an employee who's here for nine years, who did a good job for nine years, who had some criticism, as you would expect in a performance evaluation, but if you look at overall, overall, I mean this is what Judge Tarnow did. And I couldn't believe this, that the argument he suggested is that, well, she was never rated outstanding, as if that's the reason that she doesn't have to be considered. Number two, he says, well, Ms. Topansky said she had problems with her travel. Here's an issue. Here's an issue. The travel Ms. Topansky talks about was in September of 2015. Well, her complaint was not that there was any missed meetings or missed flights or missed cars. Her suggestion was, her criticism was that Ms. Brown should have given individual notice to all the participants of the meeting, instead of sending a general thing to everybody saying Ms. Topansky won't be at the meeting. That was her criticism, that it should have been an individual email to each person saying Ms. Topansky won't be there. Not that she missed a meeting, not that Ms. Brown did anything improper, but that somehow this was some criticism. And she comes in. Does this make any sense? I'll stop. Ms. Topansky had her last day of employment. Her last day of employment would go in as her last act at the company, go in and do something that changes her evaluation. All it did was change her evaluation for one category, for travel. Not poor performer, not miserable performer, just solid contributor minus.  All right. Thank you. Thank you, Your Honor. You have your rebuttal. Morning. Morning, Your Honors. May it please the Court. Employers making job decisions, of course, have the right to set standards, criteria, things that they find disqualifying or not disqualifying. And one of those criteria that's used probably every day within this circuit, within this country, when hiring decisions are made or any decision, promotions, raises, things like that, is how does this person perform in their job duties? And here we have a situation where an employee was laid off and wanted to be rehired. And, of course, the employers had the right to look at her past performance and make decisions on whether they would hire her. As your friend points out, there was a lot of positive in those reports as well. She's often listed as solid contribution for many of the skill sets. I mean, why shouldn't a jury decide, given the mixed record, whether it was pretext? Well, Your Honor, I would say that this Court has consistently held that it's not the place of the Court to act as a super personnel department and basically reweigh the decisions that were made. The questions here are twofold. One, is it legitimate for an employer to look at the prior performance of this employee and decide whether they believe this person should be interviewed further? The undisputed record, and it is important to point this out, it was an inconsistent track record. She was never outstanding in 10 years of being a secretary. She was either at the mid-level of meets expectations, solid, or improvement requires. And there were specific problems that the two independent reviewers, Ms. Hoy and Mrs. Zeddy, independently looked at these performance reviews and came to the same conclusion. This was a woman who had been a secretary for 10 years and had problems with attention to detail, spelling mistakes, abruptness in response to questions, defensiveness, issues with timeliness, and it was up and down. If it's not enough to terminate the person, why doesn't that create a fact issue then? I'm sorry, Your Honor? If it's not enough to terminate the employee, I mean, it certainly wasn't bad enough to terminate her. So why does that not create a fact issue? Because, Your Honor, those are two separate issues, and I think that, you know, just as a matter of, we can look at it from two ways. One, as a matter of common sense, I would posit that probably anybody who's ever hired anybody might say, look, this person isn't that bad, I'm going to fire them. But if I had to do it over again, I wouldn't necessarily rehire them for the position. And every court that has looked at this, and we've cited several other circuit courts and district courts within this circuit that have said it is, of course, legitimate. It is a legitimate non-discriminatory reason to consider the prior performance of a laid-off employee in deciding whether to rehire. So that's the second step, the legitimate non-discriminatory. It's legitimate to consider their past performance, for sure. But at what point does it just look facially implausible? Or not even facially implausible, implausible enough that a jury should decide? I believe that under the McDonnell-Douglas test, Your Honor, the question is, if you've accepted that it's legitimate, and it sounds like even the plaintiff ultimately agreed today that it's legitimate to look at prior performance, the question is, is that stated reason true, or is it false and pretext for discrimination? And here, the record, there is nothing in the record to suggest that Ms. Hoy and Ms. Zetti did not honestly believe that the problems that were apparent in Ms. Brown's record, her inconsistent performance and issues that are, frankly, kind of critical to a secretary's duties when they're looking at this cold, they're hiring for a new position, there's no evidence that that's not actually what they believed. And if they were legitimately allowed to look at this, and they actually believed it, then there is no pretext. That's the McDonnell-Douglas test. There needs to be some evidence that that was not the honestly held belief. And I don't believe there's been any argument. Is there a statement about how much time can you take off other than vacation? Well, let's talk about that, Your Honor. First, this was not said to Ms. Brown. Ms. Brown wasn't interviewed. This is a question that was asked of other applicants at their interviews. But we've pointed out that that would not even be direct evidence if it was a statement that was made to Ms. Brown. This court has held, and we cite this in the brief, that absenteeism is a legitimate concern. This court has actually held that somebody who has had FMLA but is terminated for absenteeism reasons unrelated to FMLA, that's legitimate. And so simply asking that question is not illegitimate. And it is cited in our brief, Your Honor. Now, I guess your opposing counsel's argument is that a plaintiff simply wasn't permitted to apply, or a better way to state it is her application was not looked at or entertained or evaluated. And the reason, taking into account circumstantial evidence of plaintiff's own testimony or whatever evidence is available in the record, that the reason was her, or the likely reason was her disability and the fact that she took FMLA leave, you would agree that if that were the case, she would have an arguable case or there would be disputed material facts that could go to the jury if that appeared on the surface to be the case. Well, two points, Your Honor. One, the argument that was made is not accurate. Her applications were considered. Ms. Hoy, remember, she was applying for other secretarial positions, and these were all in a relatively short time frame. So when Ms. Hoy looked at her performance reviews and saw these issues that she thought was problematic for someone applying for a secretary, for executive secretaries or secretary positions, she found these to be disqualifying, that she didn't want to move forward, and all of the positions that are at issue here were secretarial positions. So, of course, she's going to make the same decision. But they were considered, and a second person looked at was the recruiter for another position and independently came to the same conclusion. So I don't agree and I don't think the record supports the notion that they just didn't consider her application. They did, but the same problems, the three prior performance reviews, were at issue. Second, this is not a direct evidence case. Ms. McGonigal, who my colleague believes is the key to the case, she was not the person who made these decisions. There's no- What about not disclosing the openings at the termination? Okay, a couple things on that, Your Honor. First, I think it's a point that we've made. This Court has held repeatedly that a party that does not actually raise an argument in their argument section of the brief waives it. There's been no argument in the brief on this issue. So one, it should be waived, but second, it's incorrect for a couple of reasons. First, she was- There's the three positions that we're talking about, let's discuss those. The first one was Ms. German, who actually was hired before plaintiff was even laid off, before plaintiff even- the position was even going to be eliminated. If you remember the sequence here, Ms. Lipansky, who was the vice president, leaves in December. The decision is made early January not to replace her, but instead to consolidate that with the audit position in Germany. And so in January, it was decided, well, Ms. Lipansky's gone, she's not being replaced, so we're going to have to let Ms. Brown go. The first position was already filled before that even happened, so that was not an open position. The second position, she did bring it up at the interview, and she was told that she could apply for the job. And she didn't apply for the job for over a month and a half. And let's talk about this policy issue, because I think, you know, to the extent it's not waived, it's very important. This court is held, and I think if you look at the Rothstrevall case, which we cite in our brief, Rothstrevall v. Hurley Medical Center, when you're talking about a- first of all, there's not really even a policy here. And I think Judge Tarnow recognized this. There is no express policy that says if there is an open position, you have to transfer someone about to be laid off. No questions asked. No competitive hiring. They just get it. Any warm body can fill that slot. There is no policy that says that. Plaintiff is trying to infer this policy from a flow chart that's used by HR recruiting and a policy that states when and when you do not have to post a job position online. And this court is held in these policy cases. One, in the Rothstrevall case, this was actually at issue. There was a policy, and the employer said, I interpret it this way, and under this interpretation of the policy, plaintiff gets laid off. The plaintiff came to the court and said, well, no, if you read the policy my way, I should not have been the one laid off. You should have laid off somebody else. And this court found it important that the plaintiff had actually made a record to show that at least some people in the company had actually agreed that the policy was as the plaintiff had stated. There is no record here, no argument here, that anybody believed that plaintiff was just automatically entitled to a transfer and no questions asked. There has been no testimony by any of the witnesses. But your opponent is not arguing that. I'm not sure I'm following this argument. He's not saying that she automatically was entitled to the job, which necessarily even should have gotten the job. He's saying she wasn't considered because of her disability and the taking of the FMLA leave. Your Honor, on the policy question, that absolutely was the argument raised below, and I agree that it hasn't been raised here. It was raised by Judge Nalbandian's question, and Mr. Guzzoric raised it, so that's why I'm addressing it. But I would agree. Well, if it were raised, the argument's been abandoned, don't you think? I do believe it's been abandoned, but I was asked the question, Your Honor, so I wanted to answer that. But, no, I don't believe that there's any evidence that this is a policy, and there's certainly no evidence that the decision-makers, or McGonigal or Ms. Hoyers, is that he understood this to be a policy and knowingly disregarded it, such that you could show that transferring her to these positions was a false pretext for discrimination. So I would just... Isn't the issue whether there's enough evidence in the record, even if circumstantial, and it would have to be, I suppose, mostly circumstantial, since this is not a case of alleging direct evidence discrimination, whether or not there's enough disputed factual contentions as to whether her disability and the taking of FMLA leave were factors in the decision not to consider her for hire or rehire? Isn't that really the issue here? I believe the only issue that's really been preserved in the Plants briefs is that question, and comes down to really the question is, is it legitimate for these employers to look at the past performance or not? That was expressly the argument that was made in the opening appellate brief, that it's just not legitimate as a matter of law to consider prior performance. Well, that's not correct. Well, he's not saying that this morning. He's not saying that this morning, but if you look again at his second argument, it's basically the same thing. He's saying there's pretext because it's just so inherently unbelievable that they could have relied on her prior performance issues because she had good reviews as well. And, again, that's just really going to asking the court to ---- Well, you're not arguing that they didn't know she had the disability or was confined to the wheelchair and had taken a lot of FMLA leave. You're not asking us to believe that, are you? That goes to the prima facie case, and so Ms. McGonigal knew, but there is not evidence actually that Ms. Hoyer-Zazetti knew about that. But that's the prima facie case. What about on the prima facie case, what about the form of disability she filed? So on the form of disability, first, Kelsey Hayes and ZF are federal contractors, and that's actually a form that they ---- it's a voluntary form that they are required to present along with other things like veteran status and so forth. Ms. McGonigal would have access to that, but the testimony is that the recruiters do not have access to that or any of the other affirmative action. What about the decision makers? Did they work in the same building? I don't know if the record shows that they were in the same building, but they certainly testified, and there's been nothing to the contrary other than just speculation that they had met her before. They testified that they were not aware of her disability. They certainly weren't aware of her FMLA leaves because that was not ---- these were recruiters. This was not the HR manager, these two individuals. So they were outside third-party recruiters? No. They weren't employees of ---- No, Your Honor. They're internal recruiters. They're for the managers. They're internal. They're not external, no. But they were not ---- they would not have had access in this case to the disability forms or the other affirmative action forms that are required because they're federal contracts. Hoy's declaration said she did have access but didn't access it. When Hoy was acting in her role as an HR manager, she would have. She said she did not access them in this case because she was acting in the position. But she did have access. She could have accessed them, but she did not here. But, again, that goes to the ---- Would there be a record on that log or whatever? Would there be a record if she had accessed it? I don't believe that's in the record, Your Honor, and so I would only be speculating if there would be a log. There's a log in the record, you know, the electronic log. Yes, that's the log that shows the positions that were applied for and so forth. Yes, that's in the record. But that does not ---- I don't believe that shows when somebody would have accessed a system or looked at a paper file. I don't think that's what that form is. That connects the system, which is the electronic recruiting system form. But, again, we do raise that as an alternative. Judge Tarnow did find that there was a prima facie case on that aspect. He did not rule on whether there was a prima facie case on the retaliation because there is no evidence that Mr. Gazorek's letter to McGonigal was shared with the recruiters. So that's an alternative, but I don't think we have to go there. I think that this can be resolved on three key points, and I'll just end with these three key points. One, it is undisputed that Ms. Brown did, in fact, have a mixed and consistent performance record and did have specific identifiable deficiencies that the recruiters took into account. And there is no evidence in the brief or argued otherwise here today that that was not the legitimate reason. So looking at the McGonigal-Douglas test, there was legitimate to look at those factors. There's no proof that it was not the actual reason, and you could affirm based simply on the pretext finding that Judge Tarnow entered. Thank you, Your Honors. Thank you very much. Any rebuttal? Absolutely. Any questions, I'll try to keep it very brief, Your Honor. I think the Court's focused on the issue here, and the question is simply whether or not the defendant relied solely on performance or relied on other factors in their decision not to even interview Ms. Brown for open positions, for 14 open positions, and even more, she applied for more after that, and was never ever considered for any of those positions after 12 years with the company. And if you look at her performance evaluations, there are a lot of positives, and overall, her performance is a solid contributor. Under those circumstances where she wasn't terminated for performance, she wasn't even considered for termination, Ms. Lipansky said it never crossed her mind to terminate her because of performance. She was pointing out, as she correctly does, that in her performance evaluation, she was doing that. She's evaluating her performance, pluses and minuses, and overall, rated her a solid contributor. And based upon the standards of the Court with regard to pretext, because Judge Tarnow here ruled that we had established a prima facie case for all of the elements of all of the claims that we had made. What he found simply was that with regard to the retaliation and discrimination claims, that there was not enough evidence to show that there was a pretext. I would suggest to the Court that employers under these circumstances, where they have an opportunity to get rid of an employee who may be a decent performer, but creates other issues because they're gone 12 weeks out of the year, or have been gone for 12 weeks, and takes advantage of the FMLA leave, that if we have an opportunity to get rid of that employee, we're going to do it. It has nothing to do with performance. We're going to take the opportunity to get rid of that employee so we don't have to deal with that situation in the future. Ms. McConnegal acknowledged that she knew about the FMLA. She had meetings with Ms. Hoy where she discussed performance, and she had a specific meeting with Mr. Zetti where Mr. Zetti testified that McConnegal told her she would have concerns about her. Under those circumstances, I would suggest that there's certainly enough evidence to go to a jury so that they can make a determination as to what the real motivation was for the termination in this case, and the refusal to hire in this case. Unless there are questions, I thank the Court. Thank you very much, and the case is submitted.